HH

AO 106 (Rev. 04/10)  Application for a Search Warrant

# UNITED STATES DISTRICT COURT

for the

Southern District of Ohio

In the Matter of the Search of

*(Briefly describe the property to be searched or identify the person by name and address)*

Apple iPhone in blue case and Apple iPhone in purple and blue case, seized from the person or residence of Ricco L. MAYE, currently located in the evidence vault of the ATF Columbus Field Office, under property numbers 773040-20-0093-11 and 773040-20-0093-65

)
)
)
)
)
)

Case No.  2:21-mj-730

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

SEE ATTACHMENT A, INCORPORATED HEREIN BY REFERENCE

located in the _____Southern_____ District of _____Ohio_____ , there is now concealed *(identify the person or describe the property to be seized)*:

SEE ATTACHMENT B, INCORPORATED HEREIN BY REFERENCE

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 USC Secs. 1591/1594 and 1341/1343/1349 21 USC Secs 841/846 | Sex trafficking conspiracy; mail or wire fraud conspiracy and drug trafficking/drug trafficking conspiracy. |

The application is based on these facts:

SEE ATTACHED AFFIDAVIT INCORPORATED HEREIN BY REFERENCE

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Samuel Chappell, ATF TFO
*Printed name and title*

Sworn to before me and signed in my presence.

Date: November 9, 2021
_____

City and state: Columbus, Ohio

_____
Kimberly A. Jolson
United States Magistrate Judge

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| IN THE MATTER OF THE SEARCH OF: | ) | Case No. 2:21-mj-730 |
| Apple iPhone in blue case and Apple iPhone in purple | ) | Magistrate Judge |
| and blue case, seized from the person or residence of | ) | |
| Ricco L. MAYE, currently located in the evidence vault | ) | |
| of the ATF Columbus Field Office, under property | ) | |
| numbers 773040-20-0093-11 and 773040-20-0093-65 | ) | |

## AFFIDAVIT IN SUPPORT OF APPLICATION
## UNDER RULE 41 FOR A WARRANT TO
## SEARCH AND SEIZE

I, Samuel Chappell being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.      I am a Columbus Ohio Police Detective assigned as Task Force Officer (TFO)

with the Bureau of Alcohol, Tobacco, and Firearms (ATF). I have been employed by the

Columbus Division of Police (CPD) since 2007.  My responsibilities as a Task Force Officer

include the investigation of violent criminal street gangs, narcotics and firearms traffickers, money

launderers, and firearms-related crimes. I have participated in the execution of search warrants and

arrests related to the above-referenced offenses. As a TFO, I am authorized to investigate

violations of the laws of the United States and to execute warrants issued under the authority of

the United States.

2.      Through this investigation, I have discovered that Ricco L. MAYE has a criminal

history involving drug trafficking, weapons offenses, and assault.  More recent investigations

and information, as detailed below, indicate that from approximately 2018 through 2021, MAYE

has been involved in additional criminal activity related to narcotics trafficking, human

trafficking, mail/wire fraud and witness tampering. The investigation to date indicates that all of these offenses appear to be interrelated, as MAYE utilized drug-addicted females to engage in prostitution, assist him in drug trafficking, and provide their identifying information for purposes of various kinds of fraud, most recently Pandemic Unemployment Assistance (PAU) fraud.

3.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the search of the two Apple iPhones, more particularly described in Attachment A, that are currently held in the secure evidence vault of the ATF Columbus Field Office under property numbers 773040-20-0093-11 and 773040-20-0093-65 (hereinafter the **SUBJECT DEVICES**), and the seizure from the **SUBJECT DEVICES** of the electronically stored information as described in Attachment B. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter. The applied-for warrant would authorize the forensic examination of the **SUBJECT DEVICES** for the purpose of identifying and seizing the electronically stored data described in Attachment B.

4.      Based on my training and experience and the facts set forth in this affidavit, there is probable cause to believe that violations of Title 18 United States Code §§ 1591 and 1594 (Sex Trafficking by Force, Fraud or Coercion and Conspiracy to Commit Sex Trafficking); 1512 (Witness Tampering and Witness Tampering Conspiracy); 1341, 1343 and 1349 (Mail/Wire Fraud and Mail or Wire Fraud Conspiracy); and Title 21 United States Code §§ 841 and 846 (Possession, Distribution and Conspiracy to Possess and Distribute Controlled Substances), have been committed by MAYE. There is also probable cause to search the **SUBJECT DEVICES** for evidence, instrumentalities, and/or fruits of these crimes as further described in Attachment B.

2

## APPLICABLE STATUTES AND DEFINITIONS

5.      Title 18, United States Code, Section 1341 makes it a federal crime for any person to devise or intend to devise a scheme to defraud or obtain money or property by means of false or fraudulent pretenses, representations or promises, or for the purpose of executing the scheme to defraud or attempting to do so, cause to be deposited in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the United States Postal Service or any private or commercial interstate carrier

6.      Title 18, United States Code, Section 1343 makes it a federal crime for any person, having devised or intending to devise any scheme or artifice to defraud, or obtain money or property by false or fraudulent pretenses, to transmit or cause to be transmitted by means of wire, radio or television communication in interstate or foreign commerce, any writing, sign, signal, picture or sound, for the purpose of executing such scheme or artifice.

7.      Title 18, United States Code, Section 1349 makes it a federal crime to conspire with one or more persons to commit a violation of 18 U.S.C. §§ 1341 or 1343.

8.      Title 18, United States Code, Section 1591 makes it a federal crime for any person, in or affecting interstate or foreign commerce to recruit, entice, harbor, transport, provide, obtain, advertise, maintain, patronize or solicit, by any means, a person, knowing, or in reckless disregard of the fact that the person has not attained the age of 18 years and will be caused to engage in a commercial sex act. Section 1594 of the same title prohibits attempts or conspiracies to engage in such acts.

9.      Title 21, United States Code, Section 841 makes it a federal crime for any person to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute or dispense a controlled substance. Subsection (b) of this section makes cocaine, cocaine base,

3

heroin, N-phenyl-N-[1-(2-phenylethyl)-4-piperidinyl] propanamide, commonly referred to as fentanyl, and any of their isomers controlled substances.

      10.     Title 21, United States Code, Section 846, makes it a crime for any person to attempt or conspire to commit any offense defined in Section 841.

## PROBABLE CAUSE

      11.     In 2005, MAYE was convicted of attempted carrying a concealed weapon and aggravated assault in the Franklin County Court of Common Pleas. In 2001 and 2002, he was convicted in two separate cases of domestic violence offenses in the Franklin County Ohio Municipal Court. In 2010, he was convicted in the U.S. District Court for the Southern District of Ohio for distribution of cocaine base, in violation of 18 U.S.C. § 841. He was sentenced to a term of incarceration of 70 months on December 16, 2010, and was released from the custody of the Bureau of Prisons on or about January of 2014.

      12.     MAYE is currently incarcerated pursuant to an indictment in the United States District Court for the Southern District of Ohio case, 2:20CR-00203, in which he and numerous co-defendants are charged with distribution of a controlled substance, possession with intent to distribute a controlled substance, conspiracy to distribute and possess controlled substances, conspiracy to commit sex trafficking by force, conspiracy to commit wire and mail fraud, obstruction, and witness tampering conspiracy. The facts underlying these charges are summarized in the following paragraphs.

### Narcotics Trafficking

      13.     Since his release from incarceration until his federal arrest on or about November 18, 2020, MAYE has continued to traffic in narcotics. Numerous investigations into MAYE's criminal activities, as summarized below, have been conducted by various law enforcement

4

agencies since at least 2018, which have revealed the details of MAYE's ongoing criminal drug trafficking activities.

14.     Between October 16, 2018, to November 29, 2018, the Columbus Division of Police (CPD) Narcotics Unit used a Confidential Informant (CI) to conduct three controlled purchases of narcotics from MAYE and or people directly controlled by MAYE. The narcotics the CI purchased were later tested by the Columbus Crime Laboratory and tested positive for acetyl fentanyl, fentanyl, cocaine and/or a mixture of those substances.

15.     On or about September 2, 2019, uniformed CPD officers were dispatched to Riverside Hospital located at 3535 Olentangy River Rd. on a report of a domestic dispute. Once at the scene, officers made contact with an adult female, M.M., and MAYE. Both stated that they knew each other and had been in a minor argument. While officers were running a warrant check, M.M. told officers she had just swallowed fentanyl. A medic was requested, and M.M. was transported to the emergency room. While conducting a pat down of MAYE for weapons, officers felt what they thought to be a large amount of US Currency. The officer asked MAYE about it, and MAYE replied that it was a few thousand dollars. When asked if he was employed, MAYE replied that he was a professional gambler. While speaking with MAYE, officers located a piece of notebook paper wrapped in a ball behind a tree where initial contact with MAYE had been made. Officers unwrapped the paper and found what appeared to be suspected crack cocaine. Subsequent laboratory analysis determined the substance to be 1.7 grams of cocaine base. Officers arrested MAYE and conducted a search of his person, recovering $1,707.00 in US Currency from his pocket.

16.     Since approximately late 2019, members of the ATF and the Central Ohio Human Trafficking Task Force (HTTF) have executed search warrants, conducted controlled purchases,

and interviewed numerous associates of MAYE. Records from MAYE's email accounts and witness statements revealed that in early June 2020, MAYE and others traveled to Arizona to purchase more than 500 grams of cocaine. After purchasing the cocaine, MAYE sealed the narcotics in potato chip bags to try to avoid law enforcement detection. MAYE then had two of his associates bring the narcotics back to Columbus, Ohio via a greyhound bus while MAYE flew back to Columbus to await the return of the narcotics. Once the associates returned to Columbus, MAYE sent another associate to pick them up. All of the associates were transported to a location controlled by MAYE where MAYE took possession of the narcotics and prepared them for distribution.

17.     On or about October 7, 2020, investigators utilized a confidential informant (CI) to conduct a controlled purchase of narcotics from MAYE. During the operation, the CI was monitored by investigators utilizing physical and electronic surveillance. The CI purchased suspected crack cocaine directly from MAYE. A later identification by the Columbus Police Crime Laboratory determined the narcotics to be .6 grams of cocaine base.

18.     On or about October 29, 2020, uniformed CPD officers conducted a traffic stop on a rental vehicle being driven by MAYE. During the stop, a CPD K9 unit was deployed. The K9 alerted to the vehicle. During a search of the vehicle a bag of 28 grams of suspected narcotics and narcotics paraphernalia were recovered. A field test was done on the narcotics which resulted in a positive test for cocaine. MAYE was arrested and his phone, the Apple iPhone in a blue and purple case with ATF property number 773040-20-0093-65, was taken as evidence. A later test done by the Columbus Division of Police Crime Laboratory did not find any controlled substance in the 28 grams recovered from the vehicle. A prior federal search warrant 2:20-MJ-748 was executed on this phone. Pursuant to the search warrant for this device, law enforcement

6

attempted to conduct a forensic extraction of the device, but the then-available technology did not permit the examiner to extract any data from the phone.

*Overdose Death of Michael Borck*

19.     On or about November 18, 2018, CPD officers received a call to 505 E. Columbus St. for a well-being check. As the initial officer arrived, he was met by the ex-wife of Michael Borck. She explained that Michael Borck was a recovering addict and that he checked in with his family every day. Borck's mother had not heard from him in more than 24 hours, was therefore concerned about his well-being, and contacted Borck's ex-wife.

20.     Borck's vehicle was parked in the rear of 505 E. Columbus St., and his ex-wife had knocked on the windows of the residence but did not get an answer. MAYE was also at the residence and told the officer that he was there to check on his friend Michael who had not returned his phone calls. The officer requested that both MAYE and the ex-wife call Borck's mobile phone. When they did, the officer heard a phone ring inside the home and became concerned for Borck's well-being. The officer contacted Columbus Division of Fire (CFD) personnel, who responded to the scene and drilled open the locks to the front door of the apartment.

21.     Once they were able to make entry into the apartment, officers found Michael Borck obviously deceased in his bed. MAYE attempted to enter and/or refused to exit the apartment while officers were still in the process of securing it. MAYE had to be escorted from the apartment after being told several times to leave.

7

22.     In the kitchen area of Borck's apartment, officers observed a bag of white powder that had been torn open. A small pile of the powder was on the table next to the bag. Michael Borck was pronounced dead by a CFD medic.

23.     The Franklin County Coroner's Office subsequently responded and processed the scene, collecting evidence including a plastic bag containing an unknown white powder, a business card, and a one-dollar bill. The Coroner's Office later issued a report in which it found that Borck's death was caused by acute fentanyl, tramadol, and cocaine intoxication. Residue from the one-dollar bill was positive for lidocaine, tramadol, levamisole, norcocaine, cocaine, fentanyl and quinine. Residue from the business card was positive for lidocaine, tramadol, cocaine, fentanyl, and quinine. The unknown powder in the plastic bag tested positive for lidocaine, tramadol, cocaine, dipyrone, mannitol, fentanyl and quinine.

24.     On or about November 20, 2018, Borck's father contacted CPD about his son's overdose death. He had Borck's cell phone and had found messages that he believed Borck had exchanged with a drug dealer to arrange to purchase drugs. The father provided the phone to CPD for examination.

25.     A search of the phone showed multiple calls and text messages between Borck's phone and (614) 620-3738, a phone number that your affiant knows has been consistently used by MAYE. Specifically, MAYE was linked to this number by police reports and confidential informants or sources, including approximately 10 reports made to CPD. Additionally, MAYE has contacted an investigator on this case from this number. The number (614) 620-3738 was assigned to a contact in Borck's phone under the name "Rico." The following is a timeline of text messages and calls between Borck, MAYE, and Jasmine Weather, the mother of two of MAYE's children and one of his indicted co-defendants. These messages and calls were

8

recovered from Borck's and a phone belonging to MAYE that was seized during the execution of a search warrant in January of 2019 at 159 N 17th Ave. Columbus, Ohio 43203, a residence where MAYE previously resided.

26.     On November 17, 2018, at 10:46 AM, Borck sent a message to MAYE asking, "still good?". MAYE replied "Yupp." At 10:47 AM, Borck replied "Cool I'm working till noon. I'll call you then." MAYE responded "Cool." At 12:16 PM a call was placed from Borck's phone to MAYE. This call lasted one minute and six seconds.

27.     On November 17, 2018, at 12:30 PM, Weather sent MAYE a text message stating, "Mike had 160." MAYE replied a short time later saying "ok."

28.     Just more than twelve hours later, in the early morning hours of November 18, 2018, Borck sent a message to MAYE asking, "You have anymore?". At 1:11 AM, MAYE replied "Yipp." At 1:12 AM, Borck replied, "Any way you can stop over here?". MAYE responded, "I'm in west Virginia." At the time of this conversation, MAYE was wearing a court-ordered ankle monitor. Records from the monitor confirm that MAYE was in West Virginia at the time the messages were sent. Two more messages immediately followed from MAYE stating, "It's at my house tho" and "Jus let me kno."

29.     Borck replied at 1:19 AM saying, "Alright I'll go grab it." MAYE responded confirming that "it" would be there and Borck indicated that he would be there in about 20 minutes.

30.     MAYE then sent a text message to Weather at 1:20 AM stating, "Have naenae[1] check the coco. Tell me wts left." Weather responded in agreement and then sent a message

---

[1] Investigators know, based on numerous witness statements, surveillance, and seized communications, that "naenae" refers to Nasuun Ford, a known drug addict and co-conspirator of MAYE.

simply stating "Brownies." Weather then followed up with a text message at 1:23 AM stating "8 Brownies." MAYE then sent Weather two text messages back-to-back stating, "No." and "Tony." Based on the nature of this and other conversations recovered from MAYE's phone, coco, brownies, and tony appear to be code words for narcotic drugs, believed to be cocaine and fentanyl.

31.     Around the same time, Borck sent MAYE a message asking, "You mind if I get you back for this in a couple of days?". MAYE replied at 1:52 AM stating, "Yep that's cool." Borck responded thanking MAYE and stating he was on his way. This is the last text message sent from Borck's phone. MAYE replied "Okk".

32.     Location services were turned on for Borck's phone on November 18, 2018. On November 18, 2018, between the hours of 12:00 AM and 2:15 AM Borck's phone traveled from the area of his home at 505 E. Columbus Ave to the area of 159 N. 17th St. Columbus, Ohio and back. Once the phone returned to 505 E. Columbus Ave. the phone did not leave the area until after Borck was found dead. At the time of Borck's death, 159 N. 17th St. Columbus, Ohio was a residence used by MAYE to traffic narcotics according to witness statements, surveillance evidence and the execution of the search warrant at the residence in January of 2019.

33.     Investigators know from speaking to friends and family that Borck had a cocaine addiction. No one knows of any usage by Borck of any narcotics other than cocaine.

34.     Based on the evidence from the phones that is described herein and statements from witness with direct knowledge, there is probable cause to believe that Borck purchased narcotics twice during November 17 and November 18, 2018. Both drug deals were brokered and directed by MAYE, utilizing his co-conspirators to provide the drugs and collect the money on MAYE's behalf. The first narcotics purchased were cocaine as Borck requested.

10

Unbeknownst to Borck, the second narcotics purchased contained fentanyl, and his mistaken consumption of the narcotics led to an immediate overdose which resulted in his death.

*Search warrants executed on November 18, 2020*

35.     On or about November 18, 2020, three federal search warrants and an arrest warrant for MAYE were executed at locations associated with MAYE. The locations were 2106 Sagamore Rd. Columbus Ohio; 4636 Grovedale Ct. Columbus, Ohio; and 2836 Linview Ave. Columbus, Ohio.  MAYE was located at the Sagamore Rd. residence.  During the search of 2106 Sagamore Rd., investigators found several bags of suspected narcotics. The Columbus Crime Laboratory later determined that the suspected narcotics recovered from 2106 Sagamore Rd. were approximately 172 grams of fentanyl and 75 grams of cocaine.  The iPhone in a blue case with ATF property number 773040-20-0093-11 was also seized during the execution of the search warrant at 2106 Sagamore Rd. Columbus, Ohio 43219.  Pursuant to the search warrant for that residence, law enforcement attempted to conduct a forensic extraction of the device, but the then-available technology did not permit the examiner to extract any data from the phone.

36.     During a search of 2836 Linview Ave., investigators found suspected narcotics and a firearm. The Columbus Crime Laboratory later determined that the suspected narcotics recovered 2836 Linview Ave were approximately 21 one-gram bags of methamphetamine.

37.     During a search of 4636 Grovedale Ct., investigators found suspected narcotics. The Columbus Crime Laboratory later determined that the suspected narcotics recovered from 4636 Grovedale Ct. were several capsules containing residual amounts of fentanyl.

*Pandemic Unemployment Assistance Fraud*

38.     MAYE and his associates have also been indicted in a mail and wire fraud conspiracy based on their fraudulent Pandemic Unemployment Assistance (PUA) claims.  PUA

11

is a new temporary federal program created by the Coronavirus Aid, Relief, and Economic

Security Act (CARES). PUA provides up to 39 weeks of unemployment benefits to individuals

not eligible for regular unemployment compensation or extended benefits, including those who

have exhausted all rights to such benefits. In the State of Ohio, the Ohio Department of Jobs and

Family Services oversees applications and benefit payouts for PUA.

39.     Records obtained from Ohio Department of Job and Family Services show that

MAYE filed a claim for PUA, with a benefit claim effective date of March 15, 2020. His PUA

application listed his contact phone number as (614) 620-3738 and an email of

riccomaye@yahoo.com. The application further required MAYE to provide information

regarding his claimed basis for PUA benefits. MAYE answered "yes" to the question asking

whether he was unemployed as a result of Covid-19 and claimed that he had been a construction

equipment operator for the prior five years. On the application, MAYE also selected both "my

place of employment is closed as a direct result of the Covid-19 public health emergency," and

"I am unable to reach my place of employment because of a quarantine imposed as a direct result

of the Covid-19 public health emergency" as his basis for entitlement to PUA benefits. As is

discussed in greater detail below, both Ohio tax return information pertaining to MAYE and

MAYE's own statements refute MAYE's employment claims in his PUA application.

40.     On or about May 27, 2020, the Ohio Department of Job and Family Services

received a tip from a concerned citizen about potential PUA fraud. The tipster was concerned

about a Facebook post made by an account named Ricco MAYE. Investigators have identified

this account as being operated by MAYE. The post had a screenshot of a Chime bank account

with PUA deposits totaling $7,302.48. Two deposits from Odjfs-pua, federal were shown. One

was for $789.00 and the other was for $5,901.00. These deposits are further detailed below. The

12

accompanying text with the screenshot stated "I got my free money you can get yours also I am not a GREEDY N**** I will show you how to do it for FREE so we all can EAT. If u wanna look out 4 me then ok if now so what LETS ALL EAT!!"

41.     On or about June 12, 2020, a letter was sent from the Ohio Department of Job and Family Services to MAYE. The letter stated that MAYE had not submitted the required proof of earnings for entitlement to PUA benefits prior to the deadline of June 8, 2020. Further, it had been determined that MAYE was overpaid PUA benefits in the amount of $7,479.00.

42.     Detectives investigating an unrelated case listened to a jail call placed on or about August 26, 2020. The call was placed from the Franklin County Jail by General Smith to his wife Tara Beasley. During the call Beasley sounded upset and discussed being worried that she and Smith will get in trouble for misuse of PUA. Smith begins to speak to a male with whom he is incarcerated. This male is referred to as "V" during the phone call, which appears to be MAYE's co-defendant Vincent Morrow, based on the nature of this and other jail calls as well as statements by witnesses identifying Morrow as "V." Further, Franklin County Jail records confirm that Morrow was incarcerated at the Jail at the time of the phone call described herein. During the call between Smith and Beasley, Morrow also spoke to Beasley in an attempt to answer her questions about PUA. Morrow told her that he could get her in touch with someone who is out there "doing it" right now. Morrow then gave Smith a phone number and told him it is for "Rosco."[2] Smith then told Beasley to call the phone number (614) 620-3738, which, as indicated above was MAYE's phone number at the time. Beasley called the phone number, and Smith, Beasley and MAYE then engaged in a three-way phone conversation about PUA. During

[2] Your affiant knows that Ricco MAYE sometimes utilizes the alias "Rosco."

13

the conversation MAYE and Smith talked about getting PUA benefits from Pennsylvania. MAYE was asked which states are still doing it, and he replied, "I got all 50 of them." MAYE then warned Smith that states are catching on and making it a lot harder. He explained that states are requiring more documentation.

43. Investigators obtained records from Chase Bank for an account belonging to MAYE and found that, since 2018, $128,915.26 has been deposited into his account. A review of MAYE's banking records showed deposits that appeared to be PUA. The following are examples of those deposits:

- On or about June 12, 2020, a deposit was made into MAYE's bank account from Odjfs-Pua Federal PPD ID: 3113343731 for $8,268.00.

- On or about June 23, 2020, a deposit was made into MAYE's bank account from Odjfs-Pua Federal PPD ID: 3113343731 for $789.00.

- On or about June 25, 2020, a deposit was made into MAYE's bank account from Odjfs-Pua Federal PPD ID: 3113343731 deposit for 789.00.

- On or about July 3, 2020, a deposit was made into MAYE's bank account from Odjfs-Pua Federal PPD ID: 3113343731 deposit for 789.00.

44. Investigators obtained records from a Bank of America for an account belonging to MAYE and found that, since July 16, 2020, $17,107.53 has been deposited into his account. MAYE provided the email of riccomaye@yahoo.com to Bank of America. A review of MAYE's banking records showed deposits that appeared to be PUA made in the name of Sheila F Garvey. The following are examples of those deposits:

- On or about August 6, 2020, a deposit was made into MAYE's bank account from Odjfs-Pua Des: Federal ID:4367606 INDN: Sheila F Garvey for $789.00.

- On or about August 7, 2020, a deposit was made into MAYE's bank account from Odjfs-Pua Des: Federal ID:4416646 INDN: Sheila F Garvey for $2,556.00

- On or about August 14, 2020, a deposit was made into MAYE's bank account from Odjfs-Pua Des: Federal ID:4813946 INDN: Sheila F Garvey for $189.00

45.    Investigators obtained records from a Chime bank account belonging to MAYE. Records indicate that MAYE provided the email of riccomaye@yahoo.com. On or about June 9, 2020, a deposit from Odjfs-Pua to MAYE's account was returned to the sender. The reason for returning the deposit to Odjfs-Pua was due to the receiver's name not matching the name on the Chime account, which was Ricco MAYE.  The records do not indicate what the receiver's name was.  Additional records from Chime indicate that MAYE's account was set to be closed on or about August 4, 2020, for violations of its internal policies and the member agreement executed at enrollment.

46.    A review of MAYE's Chime banking records showed deposits that appeared to be PUA. The following are examples of those deposits:

- On or about May 26, 2020, a deposit was made into MAYE's bank account from Odjfs-Pua Federal for $789.00

- On or about May 26, 2020, a deposit was made into MAYE's bank account from Odjfs-Pua Federal for $5901.00

- On or about June 3, 2020, a deposit was made into MAYE's bank account from Odjfs-Pua Federal for $789.00

47.    The two deposits made from Odjfs-Pua on May 26, 2020, match the deposits shown on the screenshot posted to the Rico MAYE Facebook account.

15

48.    Records obtained from the Ohio Department of Taxation show MAYE did not file personal income taxes from 2015-2017. This is a direct contradiction to MAYE's PUA application on which he stated that he worked as a construction equipment operator for the past five years. MAYE did file a 2018 tax return with the state of Ohio, in which he claimed a federal adjusted gross income of $9,832.00 using a single filing status. MAYE received an Earned Income tax credit of $334.00. MAYE did not list an employer. Records also show that MAYE filed a 2019 tax return with the state of Ohio, claiming a federal adjusted gross income of $51,321.00. MAYE's 2019 tax return with the state of Ohio listed XAYN Educational Services, Employer Identification Number 83-1623726, as his employer. According to the Ohio Department of Taxation, they have been unable to locate any records, other than MAYE's tax return, pertaining to a business named XAYN Educational Services, with an Employer Identification Number of 83-1623726, which indicates that the company is fictitious. Your affiant conducted open source and law-enforcement database searches and has also been unable to locate any company known as XAYN Educational Services with Employer Identification Number 83-1623726.

49.    On or about June 2, 2020, MAYE applied for PUA benefits from the State of Michigan. MAYE was not eligible to receive PUA benefits from Michigan because he was not a resident of Michigan, and he had no previous employment in Michigan. MAYE was paid a total $10,200 in PUA benefits from Michigan.

50.    Other records from ODJFS and the Michigan Unemployment Insurance Agency revealed that many of MAYE's known associates also filed claims for PUA and were paid PUA benefits as a result. Taxation and wage records indicate that these claims were fraudulent, and

16

witness statements confirm that the applications were submitted at MAYS's direction and were known by the applicants to be fraudulent.

51.    On or about September 14, 2020, investigators conducted a noncustodial interview of MAYE, at MAYE's request. During the interview MAYE was asked about his employment and he claimed to be a professional gambler and that he "flips" houses. When asked about past employment MAYE stated that he has detailed cars and worked for Turners Landscaping. MAYE thought he filed his state and federal taxes in prior years. MAYE stated that he gambles at several locations in Ohio as well as at locations out of state. According to MAYE, he largely plays slot machines and has purchased the most recent house he bought to flip in Zanesville with cash he won at the casino.

52.    Investigators obtained MAYE's gambling records from Scioto Downs, a horse racing track and gaming venue located in Columbus, Ohio. For his player's card MAYE provided the email address of riccomaye@yahoo.com. The records, which reflect all of MAYE's gambling activities when he used his player's card for the venue, are summarized below.

|  | Gaming Area | Dollars In | Dollars Out | Att Pd Payout | Win/Loss |
|---|---|---|---|---|---|
| 2018 | Slot Machine | $7,518.48 | $6781.09 | $0.00 | ($737.39) |
| 2019 | Slot Machine | $89,939.19 | $67,519.63 | $16,285.62 | ($6,133.94) |
| 2020[3] | Slot Machine | $55,833.55 | $40,396.00 | $5,770.40 | ($9667.15) |
| | TOTALS | $153,291.22 | $114,696.72 | $22,056.02 | ($16,538.48) |

53.    Investigators obtained MAYE's gambling records from the Hollywood Casino in

_____

[3] The 2020 figures are for activity through approximately August 1, 2020.

17

Columbus, Ohio. The records, which reflect all of MAYE's gambling activity when he used his player's card at the venue, show that since 2012 MAYE has total losses of -$19,927.

54.    Investigators obtained MAYE's gambling records from the Hollywood Gaming at Dayton in Dayton, Ohio. The records, which reflect all of MAYE's gambling activity when he used his player's card at the venue, show that MAYE has total losses of -$70.

55.    Since at least 2018 MAYE has deposited tens of thousands into his known bank accounts consisting of unexplained income. These deposits are not consistent with what MAYE has reported on his State of Ohio tax returns. By his own admissions, MAYE claims to be a professional gambler. Records obtained to date from multiple gambling locations show that MAYE has a win/loss total of -$36,535.48.

*Human Trafficking Activities*

56.    During the course of the numerous investigations of MAYE, law enforcement had received numerous reports of MAYE's involvement in prostitution activities and his violence against the women with whom he associated. Records of communications obtained through search warrants and statements of victims and witnesses confirmed that MAYE forced and coerced numerous women, including specifically three adult women, I.E., P.R. and M.M., to engage in prostitution activities for MAYE's financial benefit. The information your affiant has gained from the sources identified above has revealed the following:

57.    Beginning at least in late 2018 or early 2019, MAYE began providing narcotic drugs to I.E., P.R., and M.M. MAYE initially provided these drugs, including, but not limited to, cocaine and fentanyl, to the women for free. However, he soon required payment in various forms. MAYE eventually suggested that the women earn drug money through prostitution, and he provided means for them to engage in prostitution activities.

18

58.     Specifically, MAYE frequently obtained hotel rooms at various locations in the Columbus, Ohio area where I.E., P.R., and M.M. engaged in commercial sexual activity. They advertised their availability for commercial sexual activity through websites such as Backpage, Skipthegames, and Megapersonals, among others. At times, MAYE provided cellular phones with which the women accessed the internet to post the prostitution advertisements and took photos that were included in those ads. MAYE also, at times, took the photos of the women for the ads, directed the women as to when they were to post the ads, and communicated, via cell phone, with potential prostitution customers who responded to the ads.

59.     MAYE collected the money that the women received from prostitution customers and, in return, provided the women with the drugs they needed to avoid withdrawal-related illness. MAYE required the women to maintain contact with him through cellular phones in order to provide him with information pertaining to their commercial sexual activities. The women also stayed in contact with MAYE through the Facebook Messenger application, and a search warrant for the content of MAYE's Facebook account revealed conversations about commercial sexual activities of the women, including the amounts of money they had made and their need for drugs from MAYE.

60.     MAYE established various rules that I.E., P.R. and M.M. were required to follow. Specifically, they were not permitted to consume any more drugs than what MAYE had allowed or to obtain drugs from anyone else. MAYE utilized other associates to monitor the women's activities when he was not physically present at their location, to ensure that they complied with these rules. If MAYE was informed or learned that the women had broken any of his rules, he punished that woman, generally through physical violence, as well as the withholding of drugs.

19

## TECHNICAL TERMS AND INFORMATION PERTAINING TO
## THE SUBJECT DEVICES

61.     As detailed in the Probable Cause section above, the **SUBJECT DEVICES** are

currently in the lawful possession of the ATF.  At the time the **SUBJECT DEVICES** came into

the ATF's custody the technology did not exist to conduct forensic examinations on the

particular make and model of phones at issue. Due to advancements in technology, your affiant

now believes that it will be possible to forensically extract the content of the **SUBJECT**

**DEVICES**.

62.     The **SUBJECT DEVICES** are currently in storage at the evidence vault of the

ATF. In my training and experience, I know that the **SUBJECT DEVICES** have been stored in

a manner in which their contents are, to the extent material to this investigation, in substantially

the same state as they were when the **SUBJECT DEVICES** first came into the possession of the

ATF.

63.     Based on my training and experience, I use the following technical terms to

convey the following meanings:

        a.  Wireless telephone:  A wireless telephone (or mobile telephone, or cellular

           telephone) is a handheld wireless device used for voice and data communication

           through radio signals.  These telephones send signals through networks of

           transmitter/receivers, enabling communication with other wireless telephones or

           traditional "land line" telephones.  A wireless telephone usually contains a "call

           log," which records the telephone number, date, and time of calls made to and

           from the phone.  In addition to enabling voice communications, wireless

           telephones offer a broad range of capabilities.  These capabilities include: storing

names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b. Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c. Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to

21

store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d.  GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e.  PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer

22

software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

f.  IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

g.  Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

64.  Based on my training, experience, and research, and from consulting the manufacturer's advertisements and product technical specifications available online at https://www.apple.com/iphone I know that the **SUBJECT DEVICES** have capabilities that allow then to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, internet browser and PDA. In my training and experience, examining data

23

stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## BACKGROUND REGARDING CELLULAR PHONES, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS

65.     Through my training and experience, I am aware that it is common for narcotics traffickers to use cell phones, often as a vital part of their business. Narcotics traffickers commonly use cell phones to communicate with and store contact information related to both customers and suppliers. Narcotics traffickers frequently use cell phones to communicate with customers and suppliers via SMS or text message, voice calls, video calls, and social media. Narcotics traffickers often use cell phones to take photographs or videos of themselves, their associates, their property, and their products, including illegal narcotics. Further, it is common for narcotics traffickers to keep multiple cell phones. Narcotics traffickers keep multiple cell phones for a variety of reasons, including keeping customers on a separate number from suppliers and friends; avoiding or evading law enforcement detection; having a cheap, disposable phone for drug calls that can be destroyed if the phone is believed to have been compromised. Often narcotics traffickers do not register the cell phones they use in their business under their own names.

66.     Similarly, it is common for those engaged in sex trafficking to utilize cellular phones to promote their criminal activities, utilizing voice, text and social media communication modalities.  A trafficker often seeks to maintain complete control of their victims, and cell phones are often utilized to facilitate this control.  A trafficker may call or text their victim at very frequent intervals throughout the day and night to make sure that they are following directions or the "rules" the trafficker has established.  A trafficker may also use a cellular phone

24

to direct his victims as to when and where they need to be to "service" a client. Cellular phones are also the most common means to schedule prostitution "dates" with clients. Cell phone numbers are generally included in the prostitution advertisements posted on internet sites like Skipthegames.com, enabling a potential client to contact the phone number listed in the advertisement in order to schedule a "date[4]" with the girl posted in the advertisement. Communications to schedule such commercial sexual activity may occur via phone call, text message, or through a text messaging application.

67.     Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

68.     *Forensic evidence.*  As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the **SUBJECT DEVICES** were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence might be on the **SUBJECT DEVICES** because:

> h.  Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

---

[4] The term "date" is generally used to describe a sexual encounter between a prostitute and a john/client.

expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

70.    *Manner of execution.*  Because this warrant seeks only permission to examine devices already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises.  Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

71.    I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the **SUBJECT DEVICES** described in Attachment A to seek the items described in Attachment B.

Respectfully submitted,

Samuel Chappell
Task Force Officer
Alcohol, Tobacco and Firearms

Subscribed and sworn to before me
on November 9, 2021:

Kimberly A. Jolson
United States Magistrate Judge

27

## ATTACHMENT A
## PROPERTY TO BE SEARCHED

The property to be searched is an Apple iPhone in a blue case and an Apple iPhone in a purple and blue case. The **SUBJECT DEVICES** are currently located in the evidence vault of the ATF Columbus Field Office under property number 773040-20-0093-11 and 773040-20-0093-65 respectively.

This warrant authorizes the forensic examination of the **SUBJECT DEVICES** for the purpose of identifying the electronically stored information described in Attachment B.

## ATTACHMENT B
## INFORMATION TO BE SEIZED

1.     All electronically stored data on the **SUBJECT DEVICES** described in Attachment A that relate to violations of 18 U.S.C. §§ 1341, 1343, and 1349 (Mail/Wire Fraud and Conspiracy); §§ 1591 and 1594 (Sex Trafficking and Conspiracy); and 21 U.S.C. §§ 841 and 846  (Distribution/Possession of a Controlled Substance and Conspiracy to do so) involving MAYE since 2018, including, but not limited to:

    a.   lists of customers and related identifying information;

    b.   types, amounts, and prices of drugs trafficked as well as dates, places, and amounts of specific transactions;

    c.   any information related to sources of drugs (including, but not limited to, names, addresses, phone numbers, or any other identifying information);

    d.   any information recording MAYE's schedule or travel, particularly for purposes of obtaining quantities of narcotic drugs;

    e.   all bank records, checks, credit card bills, account information, and other financial records;

    f.   all locations information pertaining to the transportation and storage of narcotics and narcotics' proceeds and accompanying locations including residences, storage units, and financial institutions;

    g.   messages, emails, applications, and internet searches related to Pandemic Unemployment Assistance;

    h.   any and all messages, emails, voicemails, or social media communications pertaining to prostitution or sex trafficking, including, but not limited to, hotel reservations, car services, posting of prostitution advertisements, and communications regarding the scheduling of dates or payment for sexual services.

2.     Evidence of user attribution showing who used or owned the SUBJECT DEVICES at the time the things described in this warrant were created, edited, or deleted, such as:

a. logs, phonebooks, saved usernames and passwords, documents, and browsing history, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

b. evidence of software that would allow others to control the **SUBJECT DEVICES**, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

c. evidence of the lack of such malicious software;

d. evidence indicating how and when the **SUBJECT DEVICES** were accessed or used to determine the chronological context of computer access, use, and events relating to crime under investigation and to the computer user;

e. evidence indicating the user's state of mind as it relates to the crime under investigation;

f. evidence of the attachment to the **SUBJECT DEVICES** of other storage devices or similar containers for electronic evidence;

g. evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the **SUBJECT DEVICES**;

h. evidence of the times the **SUBJECT DEVICES** were used; and

i. passwords, encryption keys, and other access devices that may be necessary to access the **SUBJECT DEVICES**.

2